IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JASON DONALD BOLDUC, | : | Civil No. 1:24-CV-00892 |
| Petitioner, | : | |
| v. | : | |
| M. ARVIZA, | : | |
| Respondent. | : | Judge Jennifer P. Wilson |

### MEMORANDUM

Before the court is Petitioner Jason Donald Bolduc's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2241. (Doc. 1.) Petitioner is a federal inmate currently housed at a Residential Reentry Center ("RRC") managed by New York Residential Reentry Management. His petition alleges a violation of due process in the course of a disciplinary proceeding that resulted in the loss of good conduct time credit. (*Id.*) For the following reasons, the court will deny the petition and close the case.

### BACKGROUND AND PROCEDURAL HISTORY

On April 2, 2023[1], at 8:30 p.m., Petitioner was issued an incident report alleging that while he was housed at FCI-Allenwood, an inmate manufactured a hand restraint key that was located in the cell assigned to him and his cellmate.

---

[1] The court notes that the incident reports states the events occurred on March 2, 2023 in the body of the document, but on two other locations on the form, state that the events took place on April 2, 2023. (Doc. 1-1, p. 16; Doc. 14-6; Doc. 14-8.) Based on this, the court concludes the inclusion of the March 2, 2023 date was simply an error.

1

(Doc. 1-1, p. 16; Doc. 14-6.)[2] The incident report No. 3753732 states that the key was found concealed in the body of a pen that was stored in a locker that was identified as belonging to Petitioner based on the personal paperwork and mail also found in the locker. (*Id*.) The incident report states that this is considered possession of a hazardous tool and prohibited under Section 108. (*Id*.) Petitioner stated he was not guilty. (Doc. 1-1, p. 7; Doc. 14-8, p. 3.)

On April 7, 2023, the incident was forwarded to the Federal Bureau of Investigation ("FBI") for investigation and the FBI promptly declined to investigate "in lieu of BOP administrative sanctions." (Doc. 14-7.)

On April 15, 2023 at 10:00 a.m., the Unit Discipline Committee ("UDC") noted the FBI released the incident on April 13, 2023, found that Petitioner committed the prohibited act as charged, and referred it to a Discipline Hearing Officer ("DHO") for further hearing. (Doc. 14-8, p. 3.) It states that Petitioner was advised of his rights on April 14, 2023 at 12:46 p.m., he requested no witnesses, provided no documentation, and did not request to review any video evidence. (*Id*., p. 4.)

Petitioner and Respondent submitted two different April 25, 2023 incident reports. (Doc. 1-1, pp. 17–18; Doc. 14-8.) Petitioner submitted a handwritten form stating that he responded that he was not guilty and the UDC stated that it

---

[2] For the ease of reference, the court uses the page numbers from the CM/ECF header.

was referring the charges to the DHO for further hearing and advised the inmate of his appeal rights. (Doc. 1-1, p. 17.) The form states that Plaintiff was made aware of his rights on April 25, 2023 at 3:52, p.m. (*Id*, p. 18.) Otherwise, the form also refers the charge to a DHO for a hearing. (*Id*., pp. 17–19.) Respondent's form dated April 25, 2023 is typed, and includes a reference to the FBI release for institutional processing. (Doc. 14-10.) The attached investigation report states that Plaintiff requested no witnesses, presented no electronic evidence, and did not request to review the CCTV. (*Id*.)

A hearing was held on May 3, 2023. (Doc. 14-15.) Again, the record indicates that Petitioner waived the right to staff representation and witnesses. (*Id*.) At the hearing, he stated the following:

> This is a set-up, I had a problem with that officer. He threw a tray in the cell that spilled all over the wall and floor and said that's for your celly. I went and told people what happened and the officer approached me and said to stop running my mouth about the incident. Then he goes into my cell and said he found a cuff key in my locker. I don't have any need for that, it wasn't mine. I think he put it in there.

(*Id*.) The DHO reviewed the incident report and photographs and found that the act was committed as charged. (*Id*.) Petitioner was sanctioned with the loss of 41 days good conduct time, 7 days of disciplinary segregation, the loss of phone privileges for six months, and the loss of tablet privileges for six months. (*Id*.) Petitioner was provided a copy of the DHO's findings and advised of his appeal rights at the hearing. (*Id*.)

Petitioner appealed the DHO's findings through the Central Office Administrate Remedy Appeal.[3]  (Doc. 1-1.)

Petitioner filed the instant petition in May of 2024.  (Doc. 1.)  At the time the petition was filed, Petitioner was held at FCI-Allenwood in White Deer, Pennsylvania.  (Doc. 1, p. 1.)  Petitioner alleges that he was not shown a picture of the item at issue in the incident report, that a hand restraint key should be addressed under Code 208[4], that the item could not qualify as a key because it did not open the hand restraints when tried, that it took eleven days for the UDC to make a determination in violation of his due process rights, and that the officer who found the item acted out of retaliation.  (Doc. 1.)

On December 6, 2024, the court issued an order serving Respondent with a copy of the petition.  (Doc. 13.)  On December 20, 2024, Respondent filed a response.  (Doc. 20.)  On January 28, 2025, Respondent resent Petitioner a copy of the response.  (Doc. 18).  No traverse has been filed.

## VENUE

A § 2241 petition must be filed in the district where the petitioner is in custody.  *See Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484,

---

[3] Respondent does not set forth the affirmative defense of administrative exhaustion.  (Doc. 6.)  Therefore, the court will not address the administrative appeal of the DHO report further.

[4] Petitioner alleges that a Code 208 violation carries a maximum sanction of a loss of 21 good time days.  (Doc. 1, p. 7.)

494–95 (1973) ("The writ of habeas corpus does not act upon the person who seeks relief, but upon the person who holds him in what is alleged to be unlawful custody.")  While Petitioner is currently being held at a Residential Reentry Center managed out the New York Residential Reentry Management field office[5], at the time the petition was filed, Petitioner was housed at FCI-Allenwood in Union County, Pennsylvania, which is located in this district.  *See* 28 U.S.C. § 118(b).  The relevant consideration is the district of confinement at the time the petition was filed.  *See Barden v. Keohane*, 921 F.2d 476, 477 n.1 (3d Cir. 1990).  Therefore, this court is the proper venue for the action.

## DISCUSSION

Liberty interests protected by the Fifth Amendment may arise either from the Due Process Clause itself or from statutory law.  *Torres v. Fauver*, 292 F.3d 141 (3d Cir. 2002).  It is well-settled that "prison disciplinary proceedings are not part of a criminal prosecution and the full panoply of rights due a defendant in such proceedings does not apply."  *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974).  Nevertheless, the Supreme Court found that there can be a liberty interest at stake in disciplinary proceedings in which an inmate loses good conduct time.  *Id*.  Since

---

[5] The court *sua sponte* accessed the Bureau of Prisons' inmate locator, *available at* https://www.bop.gov/inmateloc/, to determine Petitioner's current location.

Petitioner's sanctions did include the loss of good conduct time, Petitioner has identified a liberty interest in this matter.

In *Wolff*, the Supreme Court set forth the following minimum procedural due process rights to be afforded to a prisoner accused of misconduct in prison which may result in the loss of good time credit: (1) the right to appear before an impartial decision-making body; (2) twenty-four hour advance written notice of the disciplinary charges; (3) an opportunity to call witnesses and present documentary evidence in his defense when it is consistent with institutional safety and correctional goals; (4) assistance from an inmate representative if the charged inmate is illiterate or complex issues are involved; and (5) a written decision by the fact finder of the evidence relied upon and the rationale behind the disciplinary action. *Wolff*, 418 U.S. at 563-67.

The Bureau of Prisons has enacted specific procedures for disciplinary proceedings. 28 C.F.R. § 541.1, *et seq*. Under these procedures, a staff member charges a prisoner with committing a prohibited act by issuing an incident report. 28 C.F.R. § 541.5(a). The incident report ordinarily must be issued within 24 hours of the time the staff member became aware of the prisoner's involvement in the incident. *Id*. The incident is then investigated. *Id*. at § 541.5(b).

After the incident is investigated, the UDC reviews the incident report and takes one of the following actions: 1) finds that the prisoner committed the

prohibited act charged and/or a similar prohibited act as reflected in the incident report; 2) finds that the prisoner did not commit the prohibited act charged; or 3) refers the incident report to the DHO for further review. *Id*. at § 541.7(a). Prohibited acts are separated into four categories based on severity: Greatest, High, Moderate, and Low. *Id*. at § 541.3(a). If a prisoner is charged with a prohibited act in the Greatest or High category, the UDC automatically refers the incident report to the DHO for further review. *Id*. at § 541.7(a)(4).

Where, as here, a prisoner challenges a disciplinary proceeding that deprived him of good-time credits, "the requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke [such] credits." *See Superintendent, Massachusetts Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985). In other words, "[t]his standard is met if there was some evidence from which the conclusion of the [disciplinary board] could be deduced[.]" *See id.* (citation and internal quotation marks omitted). Thus, determining "whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence." *See id*. Rather, "the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *See id*. at 455–56 (emphasis added) (citations omitted).

The United States Supreme Court has declined to embrace "a more stringent evidentiary standard as a constitutional requirement." *See id*. at 456. And, in declining to do so, the Supreme Court has explained as follows:

> Prison disciplinary proceedings take place in a highly charged atmosphere, and prison administrators must often act swiftly on the basis of evidence that might be insufficient in less exigent circumstances. *See Wolff*, 418 U.S., at 562–563[.] The fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact. Revocation of good time credits is not comparable to a criminal conviction, *id*. at 556[,] and neither the amount of evidence necessary to support such a conviction, see *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), nor any other standard greater than some evidence applies in this context.

*See id*.

In applying this governing legal standard here, the court finds that, with respect to most aspects of his disciplinary proceedings, Petitioner has not argued that he was deprived of the protections afforded by the requirements in *Wolff*. Instead, he argues that the UDC decision was delayed, he was prosecuted under the incorrect infraction code, the alleged key did not work, he was not allowed to review the pictures used at the hearing, and the officer who wrote the report was acting in retaliation. (Doc. 1.)

**A. The UDC Decision Was Not Delayed.**

First, Petitioner's allegation that the UDC decision was delayed is inconsistent with the record. Under 28 C.F.R. § 541.7, "[t]he UDC will ordinarily

review the incident report within five work days after it is issued, not counting the day it was issued, weekends, and holidays.  UDC review of the incident report may also be suspended if it is being investigated for possible criminal prosecution."

Here, the incident report was initially served on Petitioner on April 14, 2023.  (Doc. 14-6.)  The UDC conducted its first review on April 15, 2023 and referred the matter to a DHO.  (Doc. 14-8.)  It then appears that the UDC requested an extension to conduct a hearing for the incident report because the incident had initially been referred to the FBI, and the FBI released the incident report back to the institution on April 11, 2023, stating that "Unit team was unable to process this incident report in a timely manner required by Bureau of prisons policy."  (Doc. 14-9.)  This extension was approved.  (*Id*.)  On April 25, 2023, the UDC entered its second report.  (Doc. 14-10.)  Nothing in the UDC's conduct violated 28 C.F.R. § 541.7.  Furthermore, even if the UDC review had been untimely in its review of the case, such actions would not have a violation of due process under *Wolff*.

## B. The Evidence Was Sufficient to Support the DHO's Decision.

Petitioner also appears to challenge the evidence the DHO relied upon in entering its decision by challenging the lack of access to photos and asserting that the alleged key did not function as a key.  (Doc. 1.)

Under United States Supreme Court precedent, "a prisoner's right to produce evidence in his or her defense is limited only by the demands of prisoner safety and

institutional order, as determined by the sound discretion of the prison authorities." *See Young v. Kann*, 926 F.2d 1396, 1400 (3d Cir. 1991). The discretion that is afforded to prison officials in this context is "quite broad[:]"

> We should not be too ready to exercise oversight and put aside the judgment of prison administrators . . . [W]e must balance the inmate's interest in avoiding loss of good time against the needs of the prison, and some amount of flexibility and accommodation is required. Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence.

*See Young*, 926 F.2d at 1400 (quoting *Wolff*, 418 U.S. at 566).

As explained by the Third Circuit Court of Appeals, however, this discretion "is not without limits[,]" and the deference owed to prison officials "does not require . . . that a reviewing court defer to the arbitrary denial of an inmate's limited right[s]." *See id*. (alterations in original) (citation and internal quotation marks omitted); *Burns v. PA Dep't of Corr.*, 642 F.3d 163, 173 (3d Cir. 2011) (explaining that "[a]lthough prison officials are afforded deference regarding whether evidence might be unduly hazardous or undermine institutional safety or correctional goals, 'the discretion afforded prison officials is not without limits.'" (quoting *Young*, 926 F.2d at 1400)). As a result, a prisoner "should be allowed to ... present documentary evidence in his defense when permitting him to do so will

10

not be unduly hazardous to institutional safety or correctional goals." *See Wolff*, 418 U.S. at 566.

 The court observes that a number of federal courts have held that this limited right to present documentary evidence necessarily extends to a prisoner's limited right to access evidence that is central to his defense, particularly evidence that is potentially exculpatory, provided that disclosure of such evidence would not unduly threaten institutional safety or security. *See, e.g., Young*, 926 F.2d at 1400–02 (holding that, absent valid security reasons, a prison official's refusal to produce documentary evidence that he relied on in finding a prisoner guilty of disciplinary charges violated the prisoner's due process rights to "present documentary evidence" and "marshal the facts in his defense" (citation and internal quotation marks omitted)); *Melnik v. Dzurenda*, 14 F.4th 981, 985 (9th Cir. 2021) (explaining as follows: "[i]f a prisoner must be allowed to present evidence in his defense, it necessarily follows that he must have some right to prepare for that presentation[;] [w]ith no access to the evidence that will be presented against him, a prisoner could neither build a defense nor develop arguments and evidence to contest the allegations at the disciplinary hearing"); *Lennear v. Wilson*, 937 F.3d 257, 269 (4th Cir. 2019) (stating that "an inmate's due process rights related to ... evidence has at least two dimensions: (A) the qualified right of access to such evidence and (B) the qualified right to compel official review of such evidence");

*Rasheed-Bey v. Duckworth*, 969 F.2d 357, 361 (7th Cir. 1992) (reiterating that "an inmate is also entitled to disclosure of exculpatory evidence, unless that disclosure would unduly threaten institutional concerns" (citations omitted)); *Smith v. Massachusetts Dep't of Correction*, 936 F.2d 1390, 1401 (1st Cir. 1991) (observing that, "[i]f an inmate has a circumscribed right to present documentary evidence, logic dictates that he must also have some possible means for obtaining it"); *Meis v. Gunter, 906 F.2d 364*, 367 (8th Cir. 1990) (stating that "[inmates] have a right to reasonable access to information necessary to put on a defense, including prison documents . . .").

Here, Petitioner does not allege that he made the request for the evidence prior to the DHO hearing. Instead, in his appeal document, Petitioner states the following:

> I was not allowed to see a picture of the alleged "Inmate manufactured hand restraint Key even through I had repeatedly asked many different officers. Even when I went to my D.H.O. hearing, I asked the officer if he had a picture of it and he stated "yes, I have a picture of it" as he was shuffling through the paperwork in front of him while he was talking to me. Then he stops shuffling, announces me guilty and stands up to end the hearing. I then asked him again if he had a picture of it? He again stated "yes, I have a picture of it but you can't see it!" If you want to see it you'll have to appeal. I thought it was crazy to now be convicted of possessing something that you weren't even allowed to see a picture of.

(Doc. 1-1, p. 14.)[6] Petitioner's statement does not specifically allege that he requested the evidence prior to the hearing. Additionally, there is no evidence in the record that he made any request for evidence prior to the hearing. The April 14, 2023 investigation report by J. Bolyard states that Petitioner was advised of his rights, was given a copy of the incident report, read and indicated he understood the report, and did not make a statement and provided no written documentation. (Doc. 14-10, p. 4.) Additionally, it states that he did not request review of the CCTV. (*Id.*) Therefore, there is no evidence that Petitioner requested this evidence prior to his DHO hearing, and no evidence of a due process violation.

Furthermore, Petitioner argues that the item found in his locker could not actually open hand restraints when Officer Young tried to unlock them.[7] (Doc. 1, p. 6.) He argues that if the item could not open the hand restraints, it could not be a key. (*Id.*) However, the functionality of the key is not at issue. The Third Circuit has explicitly found that discovery of contraband in a *hidden area* accessible from a prisoner's cell is sufficient—in the prison setting—to constitute

---

[6] Petitioner also states that he asked for three witnesses when he was initially given the UDC report on April 15, 2025, but Counsel Martin told him there were no witnesses and refused to list the witnesses on the sheet. (Doc. 1-1, p. 14.) However, Petitioner signed a waiver of his right to witnesses at the time of the hearing. (Doc. 14-16.)

[7] The court notes that this second argument undermines the first. It seems that Petitioner had the ability to observe the actual item seized from his locker, just not the photo of it. And even if he did not see either the actual item or the photo, he was aware that the item did not actually work to unlock cuffs, enabling him to present this argument in his own defense.

"some evidence" that the prisoner possessed the contraband. *See Denny v. Schultz*, 708 F.3d 140, 147 (3rd Cir. 2013) (holding that discovery of two homemade shanks found in hidden space accessible from petitioner's two-person cell, by itself, constituted "some evidence" that petitioner possessed the weapons in question). As stated above, "the requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke [such] credits." *See Hill*, 472 U.S. at 455. Therefore, the court finds no due process violation in the disciplinary proceedings.

### C. Petitioner was Prosecuted Under the Correct Prohibited Act.

Petitioner additionally argues that he was prosecuted under the incorrect Code. Specifically, he alleges that he should have been prosecuted under Prohibited Act 208, not Prohibited Act 108. (Doc. 1, p. 6.) Prohibited Act 208 prohibits the "[p]ossession of any unauthorized locking device, or lock pick, or tampering with or blocking any lock device (includes keys), or destroying, altering, interfering with, improperly using, or damaging any security device, mechanism, or procedure." https://www.bop.gov/policy/progstat/5270_009_cn_1.pdf (last accessed on February 5, 2026). In contrast, Prohibited Act 108 prohibits the following:

> Possession, manufacture, introduction, or loss of a hazardous tool (tools most likely to be used in an escape or escape attempt or to serve as weapons capable of doing serious bodily harm to others; or those hazardous to institutional security or personal safety; *e.g.,* hacksaw

14

blade, body armor, maps, handmade rope, or other escape paraphernalia, portable telephone, pager, or other electronic device).

*Id*.  Here, Petitioner has been prosecuted under Prohibited Act 108 for the possession and manufacture of an item that can be used in an escape.  A key is such an item.  The fact that Petitioner could have been charged under either provision does not mean that it was error to charge him under Prohibited Act 108.  Therefore, the court finds this argument lacks merit.

### D. Plaintiff's Retaliation Claim is Not Cognizable in a Section 2241 Petition.

In the petition, Petitioner alleges that the officer who allegedly found the key was acting in retaliation: "[t]he officer who wrote the [incident report] was mad at me because he did something to my cellmate and I witnessed it and was telling other people then I ended up with a 'inmate manufactured hand restraint key in my cell.'"  (Doc. 1, p. 7.)  However, these types of claims—which sound in civil rights liability under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971)—are not cognizable in a habeas petition.  *See McGee v. Martinez*, 627 F.3d 933, 936 (3d Cir. 2010) ([T]he fact that a civil rights claim is filed by a prisoner rather than by an unincarcerated individual does not turn a § 1983 case or a *Bivens* action into a habeas petition.").  Therefore, the court will deny this petition.

## CONCLUSION

For the above-stated reasons, the petition filed pursuant to Section 2241 will be denied and the case will be closed.

An appropriate order follows.

s/Jennifer P. Wilson  
JENNIFER P. WILSON  
United States District Judge  
Middle District of Pennsylvania

Dated: February 9, 2026